UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Malachi I. Yahtues

v.                                          Case No. 16-cv-174-SM
                                            Opinion No. 2020 DNH 050
David Dionne and
Willie Scurry


                            O R D E R

     Before the court are pro se plaintiff Malachi I. Yahtues's

motion for summary judgment (doc. no. 214) and defendants David

Dionne and Captain Willie Scurry's cross-motion for summary

judgment (doc. no. 219).  The court also addresses Yahtues's

"Motion to Suppress Deposition Transcripts" (doc. no. 224) and

the defendants' two motions to strike (doc. nos. 216 and 230).

     Yahtues was held as a pretrial detainee at the Hillsborough

County Jail between 2014 and 2016.  During that time, Dionne was

the superintendent of the Hillsborough County Department of

Corrections, while Scurry was a corrections officer at the jail.

     The cross-motions for summary judgment pertain to Yahtues's

Claims 1 through 4, which are brought against Dionne and/or

Scurry through 42 U.S.C. § 1983 based on violations of the

First, Sixth, and Fourteenth Amendments.  Yahtues also brings

certain claims under the Religious Land Use and

Institutionalized Persons Act ("RLUIPA").  The factual bases for

Yahtues's claims are varied.  Generally, Yahtues asserts that

Dionne or Scurry failed to provide him access to a law library or legal assistance, held him in unhealthy and unsafe living conditions, failed to permit him to practice his religion unhindered, and failed to provide him access to adequate medical care.

The court denies Yahtues's motion for summary judgment (doc. no. 214) and grants the defendants' cross-motion for summary judgment (doc. no. 219). Yahtues's "Motion to Suppress Deposition Transcripts" (doc. no. 224) is denied. The defendants' two motions to strike (doc. nos. 216, 230) are denied as moot.

## Standard of Review

When ruling on a motion for summary judgment, the court is "obliged to review the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." Block Island Fishing, Inc. v. Rogers, 844 F.3d 358, 360 (1st Cir. 2016) (citation omitted). Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In this context, a factual dispute "is 'genuine' if the evidence of record permits a rational factfinder to resolve it in favor of either party, and 'material' if its existence or nonexistence

has the potential to change the outcome of the suit." Rando v. Leonard, 826 F.3d 553, 556 (1st Cir. 2016) (citation omitted).

Consequently, "[a]s to issues on which the party opposing summary judgment would bear the burden of proof at trial, that party may not simply rely on the absence of evidence but, rather, must point to definite and competent evidence showing the existence of a genuine issue of material fact." Perez v. Lorraine Enters., 769 F.3d 23, 29-30 (1st Cir. 2014). In other words, "a laundry list of possibilities and hypotheticals" and "[s]peculation about mere possibilities, without more, is not enough to stave off summary judgment." Tobin v. Fed. Express Corp., 775 F.3d 448, 451-52 (1st Cir. 2014).

## Background

A.    Procedural History

Yahtues brought this suit under 42 U.S.C. § 1983, alleging that Dionne and Scurry violated his rights under the United States Constitution when he was a pretrial detainee at the Hillsborough County Jail. After conducting a preliminary review and narrowing the claims, the court found that Yahtues asserted the following claims and subclaims:

> 1. HCDC Superintendent David Dionne, as the individual in charge of the HCDC, the supervisor of HCDC correctional and medical staff, and who is responsible for reviewing all administrative appeals, violated Yahtues's rights, when

Yahtues was a pretrial detainee at the HCDC, between June 25, 2014 and August 1, 2016, as follows:

a. Dionne violated Yahtues's First, Sixth, and Fourteenth Amendment due process rights to meaningfully access the courts when Yahtues was housed in segregation in the HCDC Restricted Housing Unit ("RHU"), or in Unit 2B/Maximum Security, by refusing to grant plaintiff's grievances and/or refusing to alter HCDC policies, resulting in:

i. The denial of Yahtues's physical access to the HCDC law library and to the assistance of a person trained to conduct legal research;

ii. The denial of adequate access to legal materials caused by allowing plaintiff to obtain such materials through a "page" system, in which Yahtues could receive copies of legal documents only by making a written request for the specific document; and

iii. The denial of adequate opportunities to contact the attorney representing him in his criminal case.

b. Dionne denied Yahtues's right to humane conditions of confinement, in violation of the Fourteenth Amendment Due Process Clause, with regard to the HCDC's providing Yahtues with: used underwear soiled with urine, fecal matter, blood, semen, and vaginal secretions, resulting in Yahtues developing "jock itch," bedding soiled with urine, fecal matter, blood, semen, and vaginal secretions; and used footwear, resulting in Yahtues developing a foot fungus, by:

i. Refusing to change HCDC policy with regard to the provision of used underwear and footwear;

ii. Failing to ensure bedding was properly laundered after receiving notice of the inadequacy of the HCDC's laundry procedures; and

iii. Ignoring and/or denying Yahtues's request to provide Yahtues with new unused underwear and footwear.

2. HCDC Captain Willie Scurry, in charge of HCDC operations and programs, violated Yahtues's rights, when Yahtues was a pretrial detainee at the HCDC, between June 25, 2014 and August 1, 2016, as follows:

    a. On numerous occasions, Scurry violated Yahtues's First, Sixth, and Fourteenth Amendment due process rights to meaningfully access the courts when he:

        i. Failed to adequately address Yahtues's grievances seeking legal supplies, access to the law library, and/or legal assistance; and

        ii. Failed to provide a remedy on the numerous occasions when the HCDC lost or misplaced Yahtues's outgoing legal mail.

    b. Scurry violated plaintiff's rights under the First Amendment Free Exercise Clause and RLUIPA by:

        i. Failing to provide Yahtues with "proper" Kosher meals on numerous occasions;

        ii. Providing Yahtues with rotten or spoiled Kosher food;

        iii. Denying Yahtues's grievances requesting religious headwear (a "kufi") and a prayer rug, on the basis that those items "are not part of [Yahtues's] religion";

        iv. Denying Yahtues the ability to celebrate the Jewish holiday of Passover in both 2015 and 2016, by failing to provide Yahtues with items necessary to observe the religious requirements of that holiday; and

        v. Denying Yahtues a Torah in RHU.

    c. Scurry ignored Yahtues's request to have a Torah in RHU because inmates in RHU are only allowed to have New Testament Bibles, in violation of the First Amendment's Establishment Clause and the Fourteenth Amendment's Equal Protection Clause.

3. Defendants Dionne and Scurry, acting with deliberate indifference, failed to ensure that Yahtues was provided with

proper treatment for Yahtues's serious medical and mental health needs, in violation of Yahtues's Fourteenth Amendment due process rights.

4. Defendants Dionne and Scurry endangered Yahtues's health and safety by failing to prevent Yahtues from being served spoiled food on a number of occasions, in violation of Yahtues's Fourteenth Amendment due process rights.

Doc. 192 at 8-10. Both Yahtues and the defendants, Dionne and Scurry, have moved for summary judgment in their favor on the claims.[1]

B. Facts

Yahtues was held as a pretrial detainee on criminal charges at the Hillsborough County Jail between June 25, 2014, and August 1, 2016. During the time Yahtues was at the jail, Dionne was the Superintendent of the Hillsborough County Department Corrections. Scurry was a captain at the jail with responsibility for operations, including meals, the law library, laundry, food service, housekeeping, and maintenance.

Because of his repeated misconduct and disciplinary infractions, Yahtues was, at times, housed in the jail's various restricted units. These restricted units included the jail's maximum-security unit, its administrative segregation unit, and its restricted housing unit. For security reasons, the

---

[1] On August 30, 2019, the court permitted joinder of a fifth claim that is not at issue in the motions addressed in this order. Doc. 240.

restricted units had more strict rules on inmate movement and property than those placed on the jail's general population.

1.    Access to Legal Materials

a.    Page System

When housed in the restricted units, jail regulations prohibited Yahtues from physically accessing the jail's law library.  Instead, Yahtues was required to use a "page" system to request material from the library.

The page system required Yahtues to submit requests for materials to the law librarian.  The law librarian was tasked with retrieving the requested materials for Yahtues and other inmates.  The law librarian was also available to make copies for inmates and to direct inmates to available resources.

While housed in the restricted units, Yahtues used the page system, making several requests for legal materials.  Dionne averred that the law librarian copied many cases, statutes, and texts for Yahtues while he was restricted from physical access to the library.

On occasion, Yahtues was unable to receive legal help from the law librarian to the full extent that he requested it.  For example, Yahtues requested help from the librarian in filing a motion to suppress in his criminal case.  According to Yahtues, however, the librarian did not know how to find the material he

wanted and jail officials were indifferent toward helping him with his research.  Doc. 214-3 at 2; Doc. 214-1 ¶ 9.

Yahtues also attempted to proceed pro se in his criminal case, and he asked the law librarian for case law on that subject.  The law librarian was unable to help, and Yahtues was not provided research assistance after submitting inmate requests and grievances.  Ultimately, Yahtues discharged counsel; he had four different lawyers represent him over the course of his criminal case.  Doc. 233-1 at 4 ¶ 8; doc. 219-3 at 18.

Yahtues pleaded guilty to the charges against him in 2016, and he was transferred to the New Hampshire State Prison to begin serving his sentence.  Yahtues was represented by counsel when he pleaded guilty and when he was sentenced.  In his deposition, Yahtues testified that he probably would have received a longer sentence if he had represented himself. Yahtues also testified that he did not know what his last attorney in his criminal case was unable to do because of Yahtues's inability to access to the law library.  Yahtues, however, suggested that because of his lack of access to the law library, he was unable to research an issue relating to whether he had sufficient predicate convictions to receive an armed career criminal enhancement.

b.    Time to Communicate with Counsel

Yahtues filed grievances in which he complained that, while
housed in the restricted units, he was only allowed morning
recreation time when his unit was supposed to alternate between
morning and evening recreation time.  Yahtues explained that
inmates could use their recreation time to call counsel, and he
asserted that his counsel was not available during the morning
recreation hours.  In the grievance, Yahtues stated that it was
possible that he had evening recreation time one day that week.

In response, jail staff wrote that Yahtues could not
dictate the particular time of day provided for recreation or
out-of-cell time.  In another response, jail staff explained
that the jail could not customize out-of-cell time around
Yahtues's attorney's schedule given the large number of inmates
at the jail.  The response added that Yahtues could communicate
with counsel through the mail or in-person visits.


c.    Legal Mail

Yahtues filed several grievances regarding "missing mail."
Doc. 214-1 ¶ 50.  In his declaration, Yahtues stated that he had
in his possession evidence that he believed to be exculpatory
with respect to the offenses for which he had been on trial.  He
stated that he placed that evidence in an envelope, which he
then gave to a corrections officer to mail.

In his grievance on the issue, Yahtues wrote that a corrections officer told him that the envelope containing the claimed exculpatory material was overweight and that it needed to be split into two separate mailings. Yahtues wrote in the grievance that he "complied" with that direction, and he says that he split the evidence into two envelopes which he gave to jail staff to be mailed. Doc. 214-8 at 22. Scurry, however, stated in his affidavit and in his response to Yahtues's grievance that the two envelopes were still overweight and were returned to Yahtues. Id.; doc. 214-10 ¶ 12.

Yahtues asserted that the two envelopes did not reach their intended destinations. Doc. 214-8 at 23. Yahtues asked the jail to find the missing mail by checking the mailroom and checking the local post office. Id. Scurry responded to Yahtues's request, stating that Yahtues could not tell him the date or a reasonable approximation of the date when Yahtues sent the two envelopes out. Scurry noted that there were no records of Yahtues having sent out the mail he claimed was missing. Scurry added that no one saw any additional large envelopes sent out by Yahtues after the two overweight envelopes were returned to him. In his deposition, Yahtues stated that he had no information beyond his assumptions or inferences to conclude that the jail had failed to mail his package. See doc. 219-3 at 30-31.

## 2.   Living Conditions

Yahtues received unclean undergarments from the jail that were stained with feces and urine, and he filed a grievance complaining about it.  Yahtues, however, retracted his grievance after he received new undergarments.  Doc. 214-1 ¶ 44.  Yahtues filed another grievance in which he complained that the undergarments are "pre-used which means they have been soiled with feces and urine."  Doc. 214-7 at 5 (labeled Exhibit E-4).  Scurry responded to Yahtues's grievance, stating that all used undergarments, socks, and uniforms are washed with detergent, bleach, disinfectant, and fabric softener, and that "heavily stained" items would be thrown away.  Id.  Yahtues disputed Scurry's statement on the ground that it is "well rehearsed."

Yahtues also grieved about the provision of unsanitary footwear.  Yahtues believes he caught a foot fungus because of the unsanitary footwear.  Scurry responded to Yahtues's grievance on the issue, stating that all shoes were sprayed with disinfectant.

Yahtues also filed grievances asserting that his bedding was not properly laundered.  In his affidavit, Dionne stated that the inmates at the jail can turn in dirty bedding to be laundered.  Doc. 233-1 ¶ 11.  Dionne stated that the jail does not control when inmates turn in their bedding for laundering,

unless there is an obvious sanitary issue.  Jail policy provides
that inmates at the jail "may at any point request replacement
of uniforms, bedding, socks and/or footwear, due to condition
(soiled or worn)."  Doc. 233-6 ¶ 20.

### 3.   Supply of Religious Articles

Yahtues is Jewish and identifies with a set of religious
beliefs known as "Hebrew Israelite."  To put his religious
beliefs into practice, Yahtues requested that the jail provide
him with a prayer rug and headwear known as a "Kufi".[2]

When Yahtues made requests for items on the ground that
they were necessary to his religious practice, Dionne and Scurry
consulted with a Judaic advisor, Rabbi Levi Krinsky.  In his
affidavit, Dionne stated that Rabbi Krinsky told them that a
prayer rug and Kufi were not necessary for Yahtues to practice
his faith.

As to prayer rugs, while the jail places some restrictions
on the size and sourcing of prayer rugs, they are not
prohibited.  Doc. 233-6 ¶ 13.  The jail, however, does not
provide prayer rugs to inmates at its cost.  In response to

---

[2] Scurry could not recall any request from Yahtues for
religious headwear other than a passing reference in a
grievance.  Doc. 233-6 ¶ 14.

Yahtues's request for a prayer rug, Scurry coordinated a meeting between Yahtues and Rabbi Krinsky to discuss their faith.

Additionally, while he was housed in the restricted units, Yahtues asked for a "full Bible," i.e., one containing both the Old Testament and the New Testament.[3]  The jail did not provide one to Yahtues while he was in the restricted units.

In his affidavit, Dionne stated that, because of the First Amendment's Establishment Clause, the jail is prohibited from purchasing at its cost religious texts such as Bibles, Torahs, or Qurans.  To provide inmates access to religious texts, the jail relies on donated texts or texts obtained by inmates and sent from approved sources.  Doc. 233-1 ¶ 9.  Dionne added that Yahtues had full access to the Torah to the extent the jail had copies available from these sources.  Scurry conducted research on the internet to try to find information for Yahtues about the cost and method of ordering a Torah from an approved source.

In his declaration, doc. 214-1, Yahtues states that he filed a grievance in which he requested access to a Bible containing the Torah that was already in his possession but unavailable to him because he was in a restricted unit.  The

---

[3] Yahtues specifically wanted the books of the Torah for his religious practice.  Because the Old Testament generally incorporates the Torah, Yahtues observed that a Christian Bible containing the Old Testament would also contain the texts Yahtues requested for his religious practice.

grievance that Yahtues identifies as supporting his claim, however, demands only that a Bible containing the Torah be provided to him, not that he be provided access to a Bible containing the Torah that he already owned. Doc. 214-5 at 3-4 (labeled Exhibits C-3 and C-4). Yahtues did not write in the grievance that he already had a Bible containing the Torah from a jail-approved source in his personal property and that he just needed access to it while in the restricted units. Scurry responded to Yahtues's grievance, stating that no Bibles containing Torah were available that met the security standards for the restricted units. Scurry also noted that Yahtues had a jail-issued Bible while outside the restricted units, but he pointed out that it was not available.[4]

### 4. Religious Diet

#### a. Passover

Yahtues filed grievances about the provision of necessary foodstuffs for him to celebrate Passover. In his declaration, Yahtues stated that to properly celebrate Passover the following items are necessary: Matzah, bitter herbs (horseradish), hard-boiled egg, chopped nuts, apples, honey, greens, and grape

---

[4] Because of security concerns regarding their physical size, not all jail-issued Bibles are permitted in the restricted units.

juice.  Yahtues also testified that lamb is necessary.  Doc. 219-3 at 46.

The jail provided Yahtues with a Matzah "cracker" in addition to Yahtues's Kosher meals.  Dionne and Scurry believed that a Matzah cracker was the only necessary item for Passover for Yahtues's practice based on the advice of Rabbi Krinsky. Scurry also researched information for Yahtues about how Yahtues could purchase additional items from an approved source for the celebration of Passover.

### b.  Spoiled Kosher Food

Yahtues also filed grievances about receiving inappropriate and/or spoiled Kosher food from the jail.  On Rabbi Krinsky's advice, Scurry arranged to have Kosher chicken purchased from a local Whole Foods store and hard-boiled eggs prepared for Yahtues.  Doc. 233-6 ¶ 10.  This arrangement lasted for "months".  Doc. 219-3 at 53.

The jail also provided Yahtues with prepackaged, freeze-dried Kosher meals.  Yahtues observed a greenish hue on at least some of those prepackaged meals.  In his declaration, Yahtues identified specific examples of spoiled meals: an instance when he received a spoiled omelet and potato tray and a spoiled pot roast beef tray.  As to the omelet tray, Yahtues stated that the tray was replaced with a new tray that Yahtues said was "okay".

Doc. 214-6 at 12 (labeled Exhibit D-8).  As to the pot roast
tray, Yahtues complained of a "strange smell," "weird taste,"
and a "greenish hue."  Doc. 214-6 at 17 (labeled Exhibit D-
12(a)).  According to Scurry's response to Yahtues's grievance
on the issue, the meal was replaced and Yahtues ate it without
issue.[5]  Id.  Yahtues received another pot roast tray with a
green hue and the tray was again replaced.

In response to Yahtues's grievances about the green hue on
the food, Scurry contacted the jail's vendor for prepackaged
Kosher foods.  The vendor told Scurry that the prepackaged meals
complied with applicable regulations for health and safety
serving time frames.  The vendor also told Scurry that the green
hue was an expected result of the flash freezing process.  This
information was communicated to Yahtues.  Doc. 214-6 at 22.

### c.  Milk & Meat Mixtures

Yahtues was served dairy products (milk) alongside meat,
which violates the dietary rules for his religious practice.
Yahtues identifies one grievance, on April 1, 2015, concerning
milk and meat mixtures.[6]  Scurry responded to Yahtues's grievance

---

[5] Yahtues was treated with Pepto-Bismol to settle his
stomach.

[6] In his declaration, Yahtues also identified another
grievance regarding the provision of chocolate pudding that he
believed was non-Kosher.  In the grievance, Yahtues placed the

and, on April 16, 2015, met with Rabbi Krinsky and received guidance from him. In his response to Yahtues's grievance, Scurry stated that "[a]fter the meeting, the issues have been explained and corrected with Inmate Yahtues present." Doc. 214-6 at 5.

### 5. Medical Care

In his deposition, Yahtues testified that he was denied medications for headaches and mental health issues. During the time he was housed there, Dr. Matthew Masewic was employed as the jail's physician. In 2017, after Yahtues left the jail, Dr. Masewic surrendered his medical license after allegations were made that he, inter alia, failed to see inmates at the jail with "significant medical conditions" and inadequately provided care for those patients; "inappropriately stopped" inmates' medications; failed to order appropriate medications for the treatment of inmates' underlying conditions; and failed to maintain adequate documentation of the medical care provided to inmates. Doc. 222-14 at 3. According to the documents

---

blame on anti-Semitic kitchen staff. In response to the grievance, Scurry consulted with Rabbi Krinsky, who concluded that the chocolate pudding served to Yahtues was Kosher.

submitted to the court by Yahtues, Dr. Masewic disputed the allegations. Id. at 4.[7]

While he was at the jail, Yahtues submitted a grievance complaining about improper treatment for a fungal condition in his foot that Yahtues believed was caused by unsanitary footwear provided by the jail. Doc. 126-28 at 1-2. In the same grievance, Yahtues complained about migraines and requested a stronger medication for them than Aspirin or Tylenol. The grievance was forwarded to the jail's health services administrator who responded that Yahtues was receiving proper treatment for athlete's foot. Yahtues testified that Dr. Masewic provided medication for his foot fungus issues.

Yahtues had an MRI at a hospital outside the jail for his headaches. The MRI returned "unremarkable" and a physical therapist directed that no further treatment was warranted. Doc. 219-3 at 4.

Additionally, in a grievance regarding his restriction to the bottom bunk of his cell due to his headaches, Yahtues complained about the improper nature of Dr. Masewic's treatment. Yahtues noted that he was going through "sleepless nites [sic] and psychological trauma" because of Dr. Masewic's treatment and the restriction. Doc. 126-28 at 4. He further stated that

---

[7] Dr. Masewic was a defendant in this suit, but he was voluntarily dismissed by Yahtues.

forcing him to see Dr. Masewic violated his rights under the Eighth Amendment. The healthcare services administrator responded that the restriction was in place due to Yahtues's complaints about migraines and a previous back injury. The administrator also recommended non-strenuous physical exercise such as walking, sit-ups, and push-ups. The administrator and Dionne further responded that Yahtues could not be forced to comply with treatment or medications.

Yahtues testified that, since leaving the jail, he has been on and off psychotropic medications and that he was in the process of trying to determine the right combination to minimize side effects while also maximizing treatment results.

## Discussion

Yahtues and the defendants filed cross-motions for summary judgment on the four remaining claims in this case and their subparts. The defendants are entitled to summary judgment in their favor on every claim.

I. Access to Courts & Communication with Counsel

    a. Access to Law Library & Legal Assistance in Segregation/Maximum Security (Claim 1(a)(i)-(ii) & Claim 2(a)(i))

In Claims 1(a)(i)-(ii) (brought against Dionne) and 2(a)(i) (brought against Scurry), Yahtues asserts that Dionne and Scurry

violated his right of access to the courts by limiting his physical access to a law library and by failing to provide him with legal assistance.  Under the Sixth and Fourteenth Amendments, state pretrial detainees have a constitutional right of meaningful access to the courts.  Lewis v. Casey, 518 U.S. 343, 352, 354-55 (1996); Holloman v. Clarke, 244 F. Supp. 3d 223, 230 (D. Mass. 2017).  To show that this right has been violated, the detainee must identify a policy or practice that denied him meaningful access to the courts and show that the policy or practice actually injured his ability to pursue a nonfrivolous legal claim.  See Holloman, 244 F. Supp. 3d at 230; Peterson v. Wrenn, No. 14-CV-432-LM, 2017 WL 401189, at *7 (D.N.H. Jan. 30, 2017) (citing Casey, 518 U.S. at 352, 354-55).  Importantly, "[t]he Constitution requires only that prisoners 'be able to present their grievances to the courts,' not that they be able to conduct generalized research.  Johnson v. Poulin, No. 07-CV-161-PB, 2008 WL 1848658, at *5 (D.N.H. Apr. 28, 2008) (quoting Lewis, 518 U.S. at 360).

Yahtues contends that the page system for jail detainees and inmates held in the restricted units was not adequate to provide meaningful access to the courts.  Yahtues has not provided evidence from which a reasonable jury could find that the jail's page system for access to the law library denied him meaningful access to the courts.  This court has previously

found that a similar page system – used when prisoners are restricted from physically accessing the library because of disciplinary infractions – was reasonable. <u>See</u> <u>id.</u> at *6 ("This method of providing access to legal research materials has been upheld as constitutionally sufficient by other courts.").

Furthermore, Yahtues has failed to provide evidence showing that, even if the page system was inadequate, he was actually injured in an attempt to bring a nonfrivolous legal claim. Yahtues pleaded guilty to the criminal charges against him, and he was, of his own accord, represented by counsel when he pleaded guilty and when he was sentenced. Yahtues claims that he could have represented himself effectively if he had more help from jail staff, but the jail is not required to provide generalized legal advice to inmates or detainees. Furthermore, Yahtues only speculates about an issue regarding his armed career criminal designation, and he presented no evidence that there was a nonfrivolous claim or argument that he[8] was unable to pursue because of a lack of access to the law library.

For those reasons, Dionne is entitled to summary judgment in his favor as to Claims 1(a)(i)-(ii) and Scurry is entitled to summary judgment in his favor as to Claim 2(a)(i).

_____

[8] Yahtues also does not explain why his lack of law library access would have precluded his lawyer from pursuing an argument that Yahtues did not meet the criteria for an armed career criminal enhancement.

b.   Access to Counsel in Restricted Units (Claim 1(a)(iii))

In Claim 1(a)(iii), brought against Dionne, Yahtues
contends that he was not provided adequate opportunities to
contact the attorney representing him in his criminal case.
Dionne argues that Yahtues has failed to show any specified harm
from any inability to contact counsel.  Yahtues contends that
showing actual injury is not necessary where the violation
regarding access to courts is brought under the First
Amendment's Free Speech Clause, citing Al-Amin v. Smith, 511
F.3d 1317, 1334 (11th Cir. 2008), and Jones v. Brown, 461 F.3d
353, 359-60 (3d Cir. 2006), in support.

"[W]hen a prison regulation impinges on inmates'
constitutional rights, the regulation is valid if it is
reasonably related to legitimate penological interests."  Turner
v. Safley, 482 U.S. 78, 89 (1987).  Courts use a four-factor
test to determine whether a jail regulation or action is
reasonable with regard to a detainee's First Amendment rights:

> (1) whether there is a valid, rational connection
> between the regulation and the legitimate government
> interest put forward to justify it; (2) whether
> alternative means to exercise the right exist; (3) the
> impact that accommodating the right will have on prison
> resources; and (4) the absence of alternatives to the
> prison regulation.

Kuperman v. Wrenn, 645 F.3d 69, 74 (1st Cir. 2011) (citing
Turner v. Safley, 482 U.S. 78, 89 (1987)).  Yahtues has not

shown evidence of an unreasonable restriction on his freedom to
communicate with counsel sufficient to create a triable issue
about whether his free speech rights were violated under the
First Amendment.

Yahtues's recreational time was restricted because he was
housed in the restricted units for disciplinary reasons.  Courts
routinely recognize jail administrators' authority to determine
how to meet the various needs of a correctional facility.  See
e.g., Overton v. Bazzetta, 539 U.S. 126, 132 (2003) ("We must
accord substantial deference to the professional judgment of
prison administrators, who bear a significant responsibility for
defining the legitimate goals of a corrections system and for
determining the most appropriate means to accomplish them.").
Here, the jail's limitation on Yahtues's recreational time while
in the restricted units was rationally connected to the
government's interest in maintaining security and discipline at
the jail.

Furthermore, Yahtues had alternative methods to communicate
with counsel, including mail and in-person visits.  And, in his
grievance, Yahtues indicated that he did have one opportunity
during the week in question to have recreation time that
coincided with counsel's telephonic availability.  Given the
evidence provided at summary judgment, the restrictions on

Yahtues's recreational time do not rise to the level of a constitutional violation.

To the extent this subclaim is brought under the Sixth and Fourteenth Amendments, Yahtues has not provided evidence to show that there was any restriction on his access to counsel that injured him. See Peterson, 2017 WL 401189, at *7. The evidence presented shows that Yahtues was able to make the filings he sought and that he was able to communicate with counsel. Dionne is entitled to summary judgment in his favor as to Claim 1(a)(iii).


c.   Loss of Legal Mail (Claim 2(a)(ii))

Yahtues asserts in Claim 2(a)(ii), brought against Scurry, that his right of meaningful access to the courts was violated because Scurry failed to provide him a remedy when the jail lost or misplaced Yahtues's outgoing legal mail. In support of his claim, Yahtues points to the two envelopes he says he mailed that were not received at their destination. Yahtues claims that the mail contained exculpatory evidence and that he would have been exonerated if the mail had been received.

Yahtues, however, pleaded guilty to the offenses with which he was charged. For that reason, Yahtues cannot show that he suffered any injury from any inability to access the courts. Furthermore, Yahtues has not shown evidence from which a

reasonable jury could infer that Scurry was responsible for the loss of his package.  Scurry is entitled to summary judgment in his favor as to Claim 2(a)(ii).


II.  Laundering Policy (Claim 1(b))

In Claim 1(b), brought against Dionne, Yahtues contests the jail's provision of used underwear and footwear, as well as its practices of laundering underwear and bedding.  Yahtues argues that he was provided with used undergarments.  Yahtues concedes that he withdrew his first grievance on this issue after being provided with an exchange of other clothing, but he contends that the exchange shows the defendants' awareness of unsanitary practices at the jail.  Yahtues also points to the defendants' "rehearsed" explanation about how the jail disinfects inmate clothing and bedding.  Yahtues asserts that he contracted "jock itch" and a foot fungus because of soiled undergarments and soiled footwear issued by the jail.

The Eighth and Fourteenth Amendments prohibit state prison officials from depriving inmates and detainees of "the essence of human dignity inherent in all persons."  Brown v. Plata, 563 U.S. 493, 510 (2011).  To show a violation of the Eighth and Fourteenth Amendments on the ground of inhumane conditions of confinement, the detainee must show that he was subjected to conditions of confinement that were severe or dangerous enough

to violate the Constitution and show that the defendant knew of and disregarded an excessive risk to the detainee's health and safety.  Giroux v. Somerset Cnty., 178 F.3d 28, 32 (1st Cir. 1999).

Yahtues fails to provide sufficient evidence in support of his claim of inhumane conditions to survive summary judgment. When Yahtues was supplied with dirty undergarments, he let Dionne know.  In response, Yahtues received new undergarments, which is consistent with the jail's policy.  The replacement of Yahtues's undergarments undercuts his claim that Dionne disregarded an excessive risk to his health and safety.

Similarly, when Yahtues complained about the disinfection process for used undergarments, he received a detailed explanation of how items are laundered at the jail.  Yahtues seeks to challenge the explanation on the ground that it is "well rehearsed," but mere speculation is not sufficient to create a genuine issue of material fact.  Garmon v. Nat'l R.R. Passenger Corp., 844 F.3d 307, 315 (1st Cir. 2016) ("Garmon's unsupported assertions, however, are insufficient to present a material issue of fact meriting trial.").  Similarly, without providing supporting evidence, Yahtues speculates that the jail's clothing and footwear were the source of his foot fungus condition and "jock itch."  Yahtues has not shown any evidence that the jail was not adhering to its policy of laundering and

disinfecting used undergarments, footwear, and bedding.
Therefore, Dionne is entitled to summary judgment as to Claim
1(b).

III. Unhindered Religious Practice (Claim 2(b) and (c))

In Claim 2(b) and (c), Yahtues contends that Scurry
violated his constitutional rights and rights under RLUIPA by
his (1) failure to provide proper Kosher meals; (2) provision of
spoiled Kosher food; (3) failure to provide religious headwear
and a prayer rug; (4) failure to provide religious food items
for Passover; and (5) failure to provide a "full Bible"
containing the Torah while in the segregation unit.

Scurry moves for summary judgment in his favor.  Scurry
contends that the evidence shows that Yahtues's claims lack
merit.  Scurry also contends that Yahtues's religious beliefs
are not sincerely held.  He argues that Yahtues sometimes failed
to adhere to his religious beliefs by purchasing pork products
from the jail commissary.

A.    Applicable Law

To prevail on a claim under the Religious Land Use and
Institutionalized Persons Act, 42 U.S.C. § 2000cc et seq., an
inmate or detainee must show "(1) that an institutionalized
person's religious exercise has been burdened and (2) that the

burden is substantial," and if he makes that showing, the burden
shifts to the defendants to show "(3) that the burden furthers a
compelling governmental interest and (4) that the burden is the
least restrictive means of achieving that compelling interest."
Spratt v. R.I. Dep't of Corr., 482 F.3d 33, 38 (1st Cir. 2007).
A burden is substantial if the challenged restriction puts
"substantial pressure" on the inmate to modify his behavior and
violate his beliefs.  See id.; McGee v. O'Brien, 160 F. Supp. 3d
407, 415 (D. Mass. 2016) ("On different occasions, the Supreme
Court has stated that 'substantial pressure on an adherent to
modify his behavior and to violate his beliefs' or a government
policy that tends to 'coerce individuals into acting contrary to
their religious beliefs' constitutes a substantial burden on
one's religious exercise.").

Restrictions on an inmate's or detainee's ability to
practice his religion do not violate the First Amendment's Free
Exercise Clause[9] so long as they were imposed pursuant to a
prison policy "reasonably related to legitimate penological
interests" and "are not an exaggerated response to such
objectives."  Beard v. Banks, 548 U.S. 521, 528 (2006) ("[T]he
Constitution sometimes permits greater restriction of such

---

[9] The Free Exercise Clause applies to the states through the
Fourteenth Amendment.  Freedom from Religion Foundation v.
Hanover Sch. Dist., 626 F.3d 1, 14 (1st Cir. 2010).

rights in a prison than it would allow elsewhere.").  As noted

above, courts use a four-factor test to determine whether a

regulation or action violates a detainee's rights under the

First Amendment:

> (1) whether there is a valid, rational connection
> between the regulation and the legitimate government
> interest put forward to justify it; (2) whether
> alternative means to exercise the right exist; (3) the
> impact that accommodating the right will have on prison
> resources; and (4) the absence of alternatives to the
> prison regulation.

Wrenn, 645 F.3d at 74 (citing Turner, 482 U.S. at 89).  Courts

owe "substantial deference to the professional judgment of

prison administrators."   Beard, 548 U.S. at 528 (quoting

Overton, 539 U.S. at 132).

The First Amendment's Free Exercise Clause, however,

provides fewer protections regarding an inmate's free exercise

of religion than RLUIPA.  Starr v. Cox, No. 05-CV-368-JD, 2008

WL 1914286, at *16 (D.N.H. Apr. 28, 2008).  Therefore, "[i]f

there is no RLUIPA violation, there will be no Free Exercise

Clause violation."  Id.; Glenn v. N.H. State Prison Family

Connections Ctr., No. 11-CV-475-JD, 2012 WL 2413934, at *3

(D.N.H. June 4, 2012) ("RLUIPA's protection exceeds that

provided by the Free Exercise Clause."), report and

recommendation approved, 2012 WL 2401734 (D.N.H. Jun. 26, 2012).

## 1. Kosher Meals (Claim 2(b)(i))

Yahtues contends that he did not receive Kosher-compliant meals and that the kitchen staff and working inmates were not certified to provide Kosher-compliant meals.  Yahtues also asserts that he was improperly provided milk as a beverage alongside meat, which is contrary to the dietary laws of his religion.

Yahtues does not provide evidence to dispute that he received Kosher-compliant prepackaged meals or Kosher-compliant meals with chicken and boiled eggs.  Given these undisputed facts, there was no substantial burden on Yahtues's religious exercise as to the provision of Kosher meals.

As to the provision of milk and meat mixtures, Yahtues filed a grievance on the subject, but the evidence shows that the problem was rectified by Scurry.  While he appears to claim that the problem continued, Yahtues identifies no further grievances that he submitted on the issue or any evidence from which a jury could find that further problems were made known to Scurry or that Scurry failed to address such problem after it was made known to him.

## 2. Spoiled Kosher Food (Claim 2(b)(ii))

Yahtues asserts that he received spoiled Kosher food. However, he did not provide evidence linking his receipt of this

food to Scurry's actions or indifference.  Rather, Yahtues says
that occasional spoliation of food items was caused by other
inmate workers in the kitchen who did not like him or his
religious beliefs.  Moreover, the evidence shows that, on the
specific occasions that Yahtues complained about spoiled meals,
they were replaced.  Cf. Abdulhaseeb v. Calbone, 600 F.3d 1301,
1321 (10th Cir. 2010) ("By identifying only one occasion when he
was forced to accept the objectionable products and failing to
provide any other specific evidence . . . [the plaintiff] failed
to establish a genuine issue of material fact as to substantial
burden . . . .").[10]  Furthermore, Yahtues's concerns about a
green hue on the prepackaged Kosher meals were investigated and
addressed by Scurry.  Given these undisputed facts, Yahtues has
failed to show that the jail placed a substantial burden on
Yahtues's ability to exercise his religion by providing him with
spoiled Kosher meals.  Yahtues has not shown facts that would
constitute a RLUIPA or First Amendment violation by Scurry as to
the alleged provision of spoiled or rotten Kosher food.

---

[10] In his deposition, Yahtues could not say how many times
he was provided spoiled meals during his two years at the jail,
but he estimated it was between one and thirty times.  Doc. 219-
3 at 33.

### 3. Religious Headwear and Prayer Rug (Claim 2(b)(iii))

Yahtues claims that he should have been provided with religious headwear and a prayer rug. The evidence identified by Yahtues and the defendants at summary judgment, however, shows that the jail did not prohibit Yahtues from having a prayer rug or any religious headwear. Rather, the jail did not provide those items to him at its cost. The requirement that Yahtues obtain these religious articles from outside sources rather than from the jail does not constitute a substantial burden on Yahtues's religious practice. See Dellinger v. Clarke, 172 F. Supp. 3d 898, 902-03 (W.D. Va. 2016) ("No substantial burden occurs if the government action merely makes the religious exercise more expensive or difficult . . . .").

Additionally, it was reasonable for Scurry to rely on Rabbi Krinsky's advice as to what was necessary to provide for Yahtues's religious practice and what was not. See Adams v. Stanley, 237 F. Supp. 2d 136, 144-45 (D.N.H. 2003) (finding that jail provided inmate reasonable opportunities to practice his religion when jail staff determined the necessary religious articles by consulting with religious authorities). Even so, Scurry did not blindly follow Rabbi Krinsky's advice without seeking input from Yahtues about his beliefs. Scurry tried to assist Yahtues in exercising his religious beliefs by arranging a meeting with Rabbi Krinsky and by researching ways in which

Yahtues could purchase items or receive donated items.  Far from showing that there was a substantial burden on his free exercise of religion, the undisputed evidence shows that Scurry worked with Yahtues to accommodate his religious beliefs.

### 4.  Passover Items (Claim 2(b)(iv))

Yahtues asserts that Scurry failed to provide appropriate items for celebration of Passover in 2014 and 2015.  Scurry argues that he consulted with Rabbi Krinsky regarding what was necessary to allow Yahtues to celebrate Passover and the Rabbi advised that only Matzah was necessary.  Yahtues does not dispute that Matzah was provided to him.

Yahtues asked for several other specific foodstuffs in addition to Matzah, but the jail did not place a substantial burden on Yahtues's ability to celebrate Passover by refusing to provide all of them.  See Kole v. Lappin, 551 F. Supp. 2d 149, 154 (D. Conn. 2008) (finding no substantial burden on inmate's ability to celebrate Passover when she was provided with Kosher meals and Matzah during the holiday, but only provided access to limited, additional items through the prison commissary); Estes v. Clarke, No. 7:15-CV-155, 2018 WL 2709327, at *7 (W.D. Va. June 5, 2018).

## 5. Torah (Claim 2(b)(v) and 2(c))

Yahtues claims that he should have been provided with a Torah during his time in the restricted units. Yahtues states that he was unable to bring his own Torah while in the units. Scurry responds that the jail was unable to provide Yahtues with a Torah because they did not have one available from accepted sources.

Yahtues has failed to provide evidence that Scurry knew that the jail had a text containing the Torah available that could have provided to him while he was in the restricted units. Yahtues has also failed to provide evidence that Scurry knew that Yahtues had a text containing the Torah in his cell that could have been provided to him while he was in the restricted units. Rather, Scurry stated in the response to Yahtues's grievance that the Bible referenced by Yahtues was issued by the facility and, per Scurry's response, was not available for use in the restricted units. For those reasons, Scurry is entitled to summary judgment as to Claim 2(b)(v).

In Claim 2(c), Yahtues also contends that Scurry violated the First Amendment's Establishment Clause and the Fourteenth Amendment's Equal Protection Clause by only allowing inmates in restricted units to have New Testament Bibles. "The Equal Protection Clause contemplates that similarly situated persons are to receive substantially similar treatment from their

government." Davis v. Coakley, 802 F.3d 128, 132 (1st Cir. 2015); see also Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000). Yahtues's equal protection claim lacks any merit because there is no evidence that the jail permitted inmates to possess New Testament Bibles but not the Torah or other religious texts.

Under the Establishment Clause, states[11] are prohibited from coercing anyone from supporting or participating in religion or its exercise. See Marrero-Mendez v. Calixto-Rodriguez, 830 F.3d 38, 44 (1st Cir. 2016). Broadly, the state must act neutrally between religion and nonreligion, as well as among different religions. See id. There is no evidence that the jail's practice or policy regarding accessibility of religious texts forced Yahtues to support any particular religion or provided favorable treatment to any religion. Rather, all religious texts provided by the jail are acquired by donation, and the evidence shows that the jail simply did not have any texts containing the Torah available for Yahtues while he was in the restricted units. Therefore, Yahtues's claim under the Establishment Clause fails.

---

[11] The Establishment Clause applies to the states through the Fourteenth Amendment. Everson v. Bd. Of Educ., 330 U.S. 1, 8 (1947).

For those reasons, Scurry is entitled to summary judgment as to Claim 2(b) and (c).

IV.  Access to Adequate Medical Care (Claim 3)

Yahtues claims, under the Fourteenth Amendment, that Dionne and Scurry acted with deliberate indifference in failing to ensure that he received proper treatment for his mental health issues.  The defendants contend that Yahtues conceded that the claim is advanced against Dionne alone, and they contend that summary judgment is warranted in their favor because Yahtues failed to disclose any medical experts and because Yahtues received the care that he demands in this lawsuit.  They also argue that Yahtues's theory that Dionne should have exercised more control over Dr. Masewic has no legal underpinning.

To establish a constitutional violation under the Fourteenth Amendment for inadequate medical care, a state detainee must show that jail officials, acting with deliberate indifference, denied him adequate care and treatment for a serious medical or mental health need.  See Plata, 563 U.S. at 545; Zingg v. Groblewski, 907 F.3d 630, 635 (1st Cir. 2018). The standard contains an objective component and a subjective component.  Zingg, 907 F.3d at 635.  The objective component requires the plaintiff to show that he had an unmet serious medical need, while the subjective component requires the

plaintiff to show that the defendant official acted with
deliberate indifference to the plaintiff's health and safety.
Miranda-Rivera v. Toledo-Davila, 813 F.3d 64, 74 (1st Cir.
2016).

Yahtues asserts that Dionne is responsible for
Dr. Masewic's failure to provide adequate medical care.  Yahtues
contends that Dionne should have intervened and had him
evaluated for mental health treatment.  Yahtues states that he
was suffering crippling headaches, hearing voices that triggered
violent episodes, that he demonstrated suicidal "tendencies",
and attempted to assault staff and other inmates.  Yahtues
asserts that he required psychotropic medications, which he was
denied under the care of Dr. Masewic.

Yahtues has not presented sufficient evidence to show that
a genuine dispute of material fact exists as to whether Dionne
acted with deliberate indifference to any serious medical need.
While Yahtues asserts that he should have received second
opinions on his diagnoses from Dr. Masewic, Yahtues was able to
receive outside tests and an outside diagnosis for his
migraines.

Yahtues does not substantiate with evidence his claims that
Dionne knew that intervention was required with regard to
Yahtues's needs for psychotropic medication.  The only grievance
that Yahtues identifies in the record on this point refers to

alleged psychological trauma resulting from Dr. Masewic's restriction that Yahtues sleep on the bottom bunk in his cell and be limited to non-strenuous exercise. Dionne responded that Yahtues did not have to comply with that treatment if he did not want to.[12]

At best, Yahtues speculates that Dionne knew about facts that should have led him to further intervene. Yahtues also concedes that he has no claim against Scurry for deliberate indifference to serious medical needs. For those reasons, Dionne and Scurry are entitled to summary judgment as to Claim 3.

## V.   Service of Spoiled Food (Claim 4)

In Claim 4, Yahtues asserts that he was served spoiled food and therefore was subjected to inhumane conditions of confinement, in violation of the Fourteenth Amendment. Dionne and Scurry assert that they are entitled to summary judgment in

---

[12] In support of his argument that Dionne knew that he needed psychotropic medications, Yahtues cites to a grievance at docket entry number 135-5. Docket entry 135 (dated December 4, 2017), however, is a "Notice of Intent" filed by Yahtues and does not contain any attachments. The court cannot find a grievance in the record that supports Yahtues's contention that Dionne was aware of facts that would make it obvious to a layperson that Yahtues required psychotropic medications and was not receiving them.

their favor because Yahtues has not shown that he was routinely provided spoiled food.

Under the Fourteenth Amendment, state detainees must be provided with safe and nutritionally adequate food. See, e.g., Plata, 563 U.S. at 510 ("A prison's failure to provide sustenance for inmates 'may actually produce physical torture or a lingering death.'"); Phelps v. Kapnolas, 308 F.3d 180, 187 (2d Cir. 2002). Yahtues asserts that he received prepackaged Kosher meals with a green hue to them that were spoiled. As noted above, in the specific instances that Yahtues asserts he was served spoiled meals and told jail staff about it, the meals were replaced. Yahtues even acknowledges in his motion for summary judgment that Scurry worked to correct the problems with his food. Doc. 214-2 at 5.

Indeed, Scurry investigated the issue and determined, based on representations from the prepackaged meal vendor, that the green hue was caused by the flash-freezing process. This information was communicated to Yahtues. Yahtues has not provided facts from which a reasonable jury could infer that he was deprived of adequate food or that either Dionne or Scurry acted with deliberate difference to conditions in which he was deprived of adequate food. Therefore, his claim that he was subjected to inhumane conditions of confinement in violation of

the Fourteenth Amendment fails.  Scurry and Dionne are entitled
to summary judgment in their favor as to Claim 4.


VI.   Motions to Strike

      A.    Yahtues "Motion to Suppress Deposition Transcripts"
            (doc. no. 224) and Defendants' Motion to Strike Errata
            Sheet (doc. no. 230)

      Yahtues objects to the court's consideration of his
deposition (doc. no. 219-3) in connection with his or the
defendants' motion for summary judgment.  He argues that the
defendants failed to comply with Federal Rule of Civil Procedure
30(e).

      "On request by the deponent or a party before the
deposition is completed, the deponent must be allowed 30 days
after being notified by the officer that the transcript or
recording is available in which (A) to review the transcript or
recording; and (B) if there are changes in form or substance, to
sign a statement listing the changes and the reasons for making
them."  Fed. R. Civ. P. 30(e).  Yahtues requested that he be
able to see the transcript of his deposition before it was
submitted in support of the defendants' motion for summary
judgment.  The defendants assert that Yahtues has the transcript
and has had the opportunity to submit an errata sheet for the
court's consideration.

Indeed, on June 24, 2019, Yahtues submitted objections to the transcript, but noted only a broad objection to the entire deposition on the basis of "Substance & Form" and "Overbreadth & Vagueness."  Doc. 232; doc. 232-1.  The defendants then moved to strike (doc. no. 230) Yahtues's errata sheet on the ground that Yahtues's objections were insufficiently specific.  In response, Yahtues moved to withdraw his errata sheet and objection to the deposition (doc. no. 235), which was granted.

Yahtues had the opportunity to file an errata sheet and did so, but he withdrew it in response to the defendants' objection. Doc. 235 at 1.  Furthermore, Yahtues failed to identify in his "Motion to Suppress Deposition Transcripts" or in his withdrawn errata sheet any irregularity or inaccuracy in the deposition transcript that would have warranted striking it from the record.  For those reasons, Yahtues's "Motion to Suppress Deposition Transcripts" (doc. no. 224) is denied.  The defendants' motion to strike Yahtues's errata sheet (doc. no. 230) is denied as moot.


B.  <u>Defendants' Motion to Strike Evidence (doc. no. 216)</u>

The defendants move to strike several exhibits from Yahtues's motion for summary judgment on the ground that they contain inadmissible content.  Generally, these exhibits constitute statements or declarations from inmates who were

housed with Yahtues.  The court has considered the material Yahtues submitted in support of the summary judgment motion, but has found that it is not germane to the issues before the court. Summary judgment is warranted in the defendants' favor regardless of the admissibility of the exhibits submitted by Yahtues.  Therefore, the defendants' motion to strike (doc. no. 216) is denied as moot.

## Conclusion

Yahtues's motion for summary judgment (doc. no. 214) is denied.  Dionne and Scurry's motion for summary judgment (doc. no. 219) is granted.  Judgment is granted in Dionne and Scurry's favor as to Claims 1 through 4 and all their subparts.

Yahtues's "Motion to Suppress Deposition Transcripts" (doc. no. 224) is denied.  The defendants' motion to strike Yahtues's errata sheet (doc. no. 230) is denied as moot.  The defendants' motion to strike exhibits submitted by Yahtues (doc. no. 216) is denied as moot.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

March 27, 2020

cc:  Malachi I. Yahtues, pro se
     John A. Curran, Esq.